UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:16-CV-149-TBR


TERESA WEATHERLY,                                                    PLAINTIFF

v.

ACBL RIVER OPERATIONS, LLC.,                                         DEFENDANT

## Memorandum Opinion

This matter comes before the Court upon Motion by Defendant ACBL River Operations, LLC, ("Defendant"), for summary judgment. [DN 21.] Plaintiff Teresa Weatherly, ("Plaintiff"), has responded, [DN 24], and Defendant has replied. [DN 25.] This matter is ripe for adjudication and, for the following reasons, **IT IS HEREBY ORDERED** that Defendant's Motion, [DN 21], is **DENIED** as to Plaintiff's claims for negligence under the Jones Act and for unseaworthiness, and **GRANTED** as to Plaintiff's claim for maintenance and cure**.**

## I. Background

This case arises out of events occurring on or around September 16, 2015. [DN 10, at 1.] Plaintiff was employed by AEP River Operations as a cook and "was assigned to the M/V Leader for approximately two and a half years prior to the…incident." DN 21-1, at 1.] "The M/V Leader's home port was Paducah, Kentucky." [*Id.*] Plaintiff was scheduled to have twenty-eight days of leave, starting on the day of the incident, and was preparing to disembark the M/V Leader when she was allegedly injured. [*Id.* at 2.]

That morning, Plaintiff had prepared breakfast for the vessel's crew and had cleaned up the galley afterwards. [DN 19, Weatherly Dep., p. 64.] This included prepping the crew's lunch and unloading the dishwasher. [*Id.* at 67-68.] After doing this, Plaintiff went upstairs to take a

shower and, after getting cleaned up, returned to the galley to retrieve some personal belongings. [*Id.* at 65.] She was "off watch" at this time. [*Id.*] Upon returning to the galley, Plaintiff picked up some dishes that were air-drying on the galley's island in order to move them to the galley table. [*Id.* at 67-68.] According to Plaintiff's deposition testimony, "[a]s I [Plaintiff] was going to the table, I slipped on something wet, my leg went out away from me and back behind me, all the plates broke. And that's when I knew that I had done some damage because I couldn't get up." [*Id.* at 68.] Plaintiff also testified in her deposition that the plates themselves were dry, she does not know what kind of substance she slipped on, how it got there, how long it had been there, or how much of it was there. [*Id.* at 70-71.] Plaintiff further testified that the weather that day was nice and so nothing wet would have been tracked into the galley, and that the floor had not been mopped that morning. [*Id.* at 72.]

When she slipped and fell, Plaintiff was wearing flip-flops and not the footwear that AEP River Operations required her to wear on the job. [*Id.* at 73.] After she fell, another crew member, Curtis Kuprel, who was the Second Mate of the M/V Leader at that time, entered the galley and assisted her. [*Id.* at 75.] Plaintiff was removed from the vessel and taken by ambulance to a Paducah area hospital. [*Id.* at 76.] Plaintiff testified in her deposition that there was no delay in her evacuation from the vessel and that she has no criticism of the "efforts that were made to assist [her] after the injury." [*Id.* at 76-77.] It was later determined that she had torn her hamstring. [*Id.* at 80.] On November 30, 2015, Plaintiff was cleared by her doctor to return to work after a "return-to-work-physical," but she did not begin working until February because she had bronchitis at the end of the year. [*Id.* at 80-81.] Plaintiff was assigned, against her wishes, to a new vessel in West Virginia, but only worked on the vessel for around a month because at that time she began to suffer from severe depression. [*Id.* at 89-90.] She testified at

her deposition that she felt "betrayed" and "humiliated" because she lost her position on the M/V Leader, whose home port is Paducah, about one and a half hours from her home, and was reassigned to the West Virginia vessel, whose home port is around eleven hours from her home. [*Id.* at 95-96.] During the period of time between September 2015 when Plaintiff was injured and February 2016 when she returned to work, she was paid short-term disability (*i.e.*, her normal pay), and testified that she did not lose any pay during that time period. [*Id.* at 128.] She also testified that she did not personally incur any medical expenses relating to the injury. [*Id.* at 128-29.]

When asked what AEP River Operations did or failed to do that caused her injury on the vessel, Plaintiff responded: "I think that those boys should have to put down their phones and go in there and clean up the galley like they should after every meal. According to the captain on the boat [that] is how the boat gets taken care of." [*Id.* at 129-30.] In essence, Plaintiff testified in her deposition that the deckhands, who are responsible for cleaning the galley, were inattentive that morning and were using their cellphones instead of doing their job. [*Id.*] Plaintiff conceded that she had not asked them to go ahead and clean up the galley on the morning in question. [*Id.* at 129.] Plaintiff voluntarily resigned her post on July 3, 2017 for personal reasons. [DN 20, Weatherly Con't Dep., p. 4.] On October 30, 2017, she was hired as a lineboat cook for Artco. [*Id.* at 5.] Plaintiff's new home port is Saint Louis, Missouri. [*Id.* at 6.] She is no longer receiving medical treatment with respect to the hamstring injury she suffered while working for AEP River Operations. [*Id.* at 8-9.]

## II. Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When examining whether a motion for summary judgment should be granted, the court is required to resolve all ambiguities and draw all reasonable inferences against the movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "not every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). Rather, the question is whether the party who bears the burden of proof in the case has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

This means that the plaintiff must present to the court more than a mere scintilla of evidence supporting her position. *Id.* Indeed, the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *Id.* It is not enough for a plaintiff to present speculation as to elements of the case, because "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

### III. Discussion

### A.

Plaintiff's first claim is for negligence under the Jones Act. "The Jones Act…authorizes seamen to maintain negligence actions for personal injury suffered in the course of employment." *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 907 (6th Cir. 2006). It "incorporates all portions of FELA [the Federal Employers Liability Act] that modify and extend the common law as applied to actions by railroad employees." *Id.* Therefore, "under the Jones Act, an employer has a duty to provide a safe workplace for its employees, and to prevail under

the Jones Act, a 'plaintiff must show that her employer [breached this duty by] failing to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known.'" *Id.* (quoting *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 449-50 (6th Cir. 2001)).

"Proof of negligence (duty and breach) is essential to recovery under the Jones Act." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001) (citing *Jacob v. City of New York*, 315 U.S. 752, 755 (1942)). And "[w]hether an employer is negligent is determined under the 'ordinary prudence' standard normally applicable in negligence cases." *Id.* (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F. 3d 331, 335 (5th Cir. 1997)). Where the two standards diverge, however, is on the causation prong: in a Jones Act negligence case, "once the plaintiff proves negligence, he need only show that his employer's negligence is the cause, in whole or in part, of his injuries…In essence, there is a reduced standard for causation between the employer's negligence and the employee's injury." *Id.* (internal citations omitted). In order "[t]o recover, [though,] the plaintiff must first establish 'the breach of a duty to protect against foreseeable risks of harm." *Id.* at 599 (quoting *Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 437 (4th Cir. 1999)). If the "plaintiff establishes that the employer breached his or her duty of care,…the plaintiff" must "'only show that the defendant's actions, however slight, contributed in some way toward causing the plaintiff's injuries.'" *Churchwell*, 444 F.3d at 907-08 (quoting *Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1463 (6th Cir. 1993)).

In her Complaint, Plaintiff alleges negligence against Defendant relating to "an unreasonably slippery environment," which, in Plaintiff's view, constituted a failure on Defendant's part "to provide a safe place to work and a seaworthy vessel." [DN 1, at 1.] Conversely, Defendant argues that (1) no one else slipped in the galley, and Plaintiff traversed

the galley all morning without incident, (2) Plaintiff was wearing flip-flops when she fell and not the mandatory foot wear she was supposed to be wearing, and (3) that there is no evidence that Defendant had any notice and/or opportunity to respond to the allegedly slippery galley floor and therefore cannot be held liable for negligence. [*See* DN 21-1, at 11-12.]

The key issue at this stage is the question of Defendant's notice and opportunity to respond to the allegedly slippery floor in the galley of the M/V Leader. "It is a fundamental principle that, under the Jones Act, an employer 'must have notice and the opportunity to correct an unsafe condition before liability will attach.'" *Perkins*, 246 F.3d at 599 (quoting *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993)). In other words, "[t]here must be some evidence from which the trier of fact can infer that the owner either knew, or in the exercise of due care, should have known of the unsafe condition." *Id.* (internal citations omitted). If Plaintiff fails to present any such evidence, then Plaintiff will have "failed to establish that Defendant[] breached a duty to protect [Plaintiff] from a foreseeable risk." *Id.* (citing *Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658, 663 (9th Cir. 1997)). In this case, Defendant argues that the record shows no actual evidence that it was on notice, actual or constructive, of any slippery condition in the galley, or that it was given a reasonable opportunity to correct any such condition. [*See* DN 21-1, at 10-11.] Indeed, Defendant argues that it is doubtful there ever was a slippery condition on the galley floor, instead attributing Plaintiff's fall to her unauthorized footwear. [*See id.*]

However, the Court finds there to be a genuine dispute of material fact as to whether Defendant had constructive notice of the wet substance on the galley floor based upon Plaintiff's deposition testimony. Therein, the questioning attorney asked as follows: "Tell me what – Tell the jury what it is that you think AEP did or failed to do that caused your injury on the boat?"

[DN 19, Weatherly Dep., pp. 129-30.] In response, Plaintiff stated: "I think that those boys [the deckhands] should have to put down their phones and go in there and clean up the galley like they should after every meal. According to the captain on the boat [that] is how the boat gets taken care of." [*Id.* at 130.] In this same deposition, Plaintiff further testified that she had not mopped the floor that morning, that this job was assigned to the deckhands, and that the deckhands had not mopped the floor either. [*Id.* at 72.] Plaintiff's accident occurred around 8:30 a.m. on September 16, 2015, approximately two and a half hours after breakfast in the galley was finished. [*Id.* at 59; *see also id.* at 130 (Plaintiff explaining that breakfast is typically over at 6:00 a.m.).] In other words, Plaintiff has provided sworn deposition testimony tending to show that, if the deckhands had completed the task assigned to them, that is, cleaning up the galley floor after breakfast at 6:00 a.m., they would have cleaned up whatever wet substance it was that Plaintiff claims to have slipped on, thereby preventing the accident. Moreover, the length of time between breakfast and her accident provided them with roughly two and a half hours to clean the floor. This is sufficient to establish a genuine dispute as to the material fact of whether Defendant was on constructive notice that the galley floor was unreasonably slippery at the time that Plaintiff fell and tore her hamstring.

In its instant Motion, Defendant does identify the fact that the deckhands had not mopped the galley floor that morning, but casts that fact as yet another reason why the floor was probably not wet (*i.e.*, because the deckhands did not complete their responsibility of mopping the galley floor, this is further evidence that the floor was not wet). However, this both simultaneously ignores the other consequence of their having not mopped the floor (whatever substance Plaintiff allegedly slipped on was still there), and omits the necessary conclusion from this piece of

information, namely, that there is a genuine dispute regarding whether Defendant was on constructive notice of the substance on the floor.

Further, the fact that the deckhands apparently did not mop the floor after breakfast as they were supposed to diminishes Defendant's argument concerning Plaintiff's inability to identify how long the substance had been on the galley floor. To be sure, Defendant presents a compelling argument concerning Plaintiff's deposition testimony about her fall, wherein she indicated that she did not know what the substance was, how it got there, how long it had been there, nor how much of the substance was on the floor. However, the substance could have been on the galley floor for hours, considering the fact that the deckhands did not mop the floor after breakfast at 6:00 a.m., and so it could have appeared moments after Plaintiff left the galley after breakfast and remained there until around 8:30 a.m., when she slipped on it. Additionally, while Defendant has presented the affidavit of then-Second Mate of the M/V Leader, Curtis Kuprel, ("Kuprel"), the Court finds that this only highlights the dispute regarding whether there was, in fact, a wet substance on the ground. And the answer to that question is far from clear. [*See* DN 21-2.] In his affidavit, Kuprel avers that he was situated right outside the galley when Plaintiff fell, and that when he entered the galley and helped her up, he inspected the floor but did not observe any wet substance. [*Id.*] But again, because Plaintiff has testified that there *was* a wet substance on the floor, Kuprel's affidavit merely solidifies the dispute in this case.

In reaching its decision concerning Plaintiff's claim for negligence under the Jones Act, this Court is guided by firmly established precedent. As the Sixth Circuit Court of Appeals has made clear, "courts should exercise special care in considering summary judgment in Jones Act cases which require a *very low evidentiary threshold* for submission to a jury." *Daughenbaugh v. Bethlehem Steel Corp., Great Lakes Steamship Div.*, 891 F.2d 1199, 1207 (6th Cir. 1989)

(internal citations omitted) (emphasis added). Indeed, "under the Jones Act, a jury question is presented if 'employer negligence played *any* part at all in the employee's injury.'" *Id.* (quoting *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 770-71 (9th Cir. 1981)) (emphasis added). Therefore, the question becomes whether there is any evidence that Defendant's negligence played a part, however slight, in Plaintiff's injury. *See Miller*, 989 F.2d at 1463 ("a plaintiff need only show that the defendant's negligence, *however slight*, contributed in some way toward causing the plaintiff's injuries.") (emphasis added).

The answer here is yes: Plaintiff's deposition testimony indicates that the deckhands did not handle their responsibility of mopping the galley floor after breakfast and, as a consequence, whatever wet substance she claims was on the galley floor was still there for her to slip on it roughly two and a half hours later. Defendant argues that Plaintiff "likely tripped over her flip-flops, which were not in compliance with Defendant's required work footwear." [DN 21-1, at 4.] Indeed, Plaintiff admitted she was not following the rules by wearing flip-flops in the galley. [*See* DN 19, at 74 (Plaintiff testifying "absolutely not" when asked whether she was permitted to wear flip-flops in the galley).] However, the question of the extent to which, if any, Plaintiff's choice in footwear contributed to her fall is not a question best decided by this Court at the summary judgment phase. As the Sixth Circuit Court of Appeals has instructed, "[w]hether due care under all of the circumstances as observed by the present shipowner at the relevant times and to what proportionate extent, if any, the employee was at fault are clearly questions for the jury determination after a full trial." *Daughenbaugh*, 891 F.2d at 1207-08 (citing *Van Horn v. Gulf Atlantic Towing Corp.*, 388 F.2d 636, 639 (4th Cir. 1968)). The Sixth Circuit went on to explain that "it would be a rare court in an unusual case which would take the [Jones Act] negligence issue away from the jury." *Id.* at 1208 (internal citations omitted). It could very well

be that Plaintiff's flip-flops did not contribute at all to her fall, or that they did to some or great extent, but that is a fact question best left for the jury.

It is unquestionable that "[a]n employer 'has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition.'" *Lett v. Omega Protein, Inc.*, 487 F. App'x 839, 843 (5th Cir. 2012) (quoting 1 Admiralty & Maritime Law § 6-22 (5th ed. 2011)). This duty would obviously extend to Plaintiff and to her area of work aboard the M/V Leader: the galley. Drawing all reasonable inferences in favor of the nonmovant, here the Plaintiff, a reasonable juror could find that Defendant was on constructive notice of the wet floor in the galley, failed to correct the condition by having the deckhands mop the floor, and that this failure proximately caused Plaintiff's torn hamstring when she allegedly slipped and fell in the substance. Of course, as explained above, the burden of proving causation is relaxed under Jones Act negligence claims. *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 383 (6th Cir. 2008). And though "[t]he mere fact that an accident occurs or that injury is sustained does not prove negligence," *Hernandez*, 187 F.3d at 438, Plaintiff has produced more than a scintilla of evidence that a duty Defendant owed to her as an employee was breached on September 16, 2015 when it failed to adhere to its own policy of mopping the floor after breakfast. Defendant's Motion is denied on this claim.

**B.**

Plaintiff's second claim is for unseaworthiness. Under the principle of seaworthiness, "[a] ship owner is strictly liable for personal injuries caused by his or her vessel's 'unseaworthiness.'" *Churchwell*, 444 F.3d at 904 (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960)). Pursuant to this doctrine, "[a] vessel is unseaworthy if the vessel and its appurtenances are not 'reasonably fit for their intended use.'" *Id.* (quoting *Mitchell*, 362 U.S. at

550). As the Sixth Circuit has explained, "[d]efective gear, an unfit or understaffed crew, or the use of an improper method of storage or unloading cargo all render a vessel unseaworthy," and, further, "[e]ven the misuse of properly functioning equipment may render a vessel unseaworthy if the misuse occurs at the direction of a superior." *Id.* (citations omitted). "Generally, unseaworthiness is a question of fact for the jury and should not be resolved by the district court as a matter of law." *Id.* (citations omitted).

In order "[t]o prevail on an unseaworthiness claim, a plaintiff must establish that a vessel's unseaworthy condition was the proximate cause of his or her injuries." *Id.* (citing *Miller*, 989 F.2d at 1463-64). Thus, "[a] vessel's unseaworthiness is the proximate cause of a plaintiff's injuries if it was a substantial factor in causing such injuries." *Id.* (citing *Miller*, 989 F.2d at 1464). This means that "unseaworthiness proximately causes an injury if it played a substantial part in bringing about or actually causing the injury and the injury was either a direct result or a reasonably probable consequence of unseaworthiness." *Id.* (citations omitted). Of course, "the owner is not obligated to furnish an accident-free ship." *Bartoe v. Missouri Barge Line Co. Inc.*, 635 F. Supp. 2d 1020, 1031 (E.D. Mo. 2009) (citing *Mitchell*, 362 U.S. at 550).

Here, the Court notes that, in essence, the facts with which Plaintiff and Defendant have presented the Court point to the principle of "transitory unseaworthiness." "[T]he law recognizes a 'distinction between 'transitory unseaworthiness,' for which there is liability, and 'instant unseaworthiness' caused by a single unforeseeable act of operational negligence.'" *Landry v. Chet Morrison Contractors, LLC*, No. 11-48, 2011 WL 6140740, at *4 (E.D. La. Dec. 9, 2011) (quoting 1 Admiralty & Maritime Law § 6-26 (5th ed. 2011)); *see also* 2 The Law of Seamen § 27:6 (5th ed. 2003) ("It is now settled by the Supreme Court's holding in *Mitchell v. Trawler*

*Racer, Inc.*[1] that a so-called 'transitory condition' (as the temporary presence of oil, water or other foreign substance) of a vessel will make the ship unseaworthy as does a permanent defect. Neither lack of knowledge nor of control of the condition is a defense to the shipowner for liability is predicated without regard to fault."). This aligns with what Plaintiff has alleged in this case, namely, that there was a transitory condition (the temporary presence of some wet foreign substance) in the galley that rendered the M/V Leader unseaworthy. It was this transitory condition that Plaintiff alleges was a substantial factor in causing her injury, the torn hamstring. The Court holds that Plaintiff's deposition testimony, pointing to the presence of a substance on the galley floor of the M/V Leader, her slip-and-fall because of that substance, as well as her testimony that the deckhands should have mopped the galley prior to her accident, all combine to create a genuine dispute of material fact as to whether the M/V Leader was unseaworthy at that time, thereby preventing the entry of summary judgment in favor of Defendant.

Defendant argues that Plaintiff "was an experienced seaman and cook," that she had been working on the M/V Leader for more than two years before she suffered this fall, that "she was responsible for cleaning and maintaining the galley," and that "[s]he transited the floors of the galley all morning without incident and no one else reported slipping in the galley." [DN 21-1, at 10.] Defendant further argues, as if it were established fact, that "[t]he galley floor was clean and without defect at the time of her fall." [*Id.*] Of course, the condition of the floor at the time of Plaintiff's fall is very much still in dispute at this time. Also, Plaintiff's status as "an experienced seaman and cook" does not somehow alleviate or otherwise lessen Defendant's duty to provide a seaworthy vessel for her. Nor does the fact that no one else slipped in the galley that morning automatically mean that (a) the floor was without defect, or that (b) the vessel was seaworthy. In short, the Court finds Defendant's argument pertaining to the vessel's seaworthiness

---

[1] 362 U.S. 539 (1960).

unconvincing. And although Defendant argues that "conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment," [*id.* at 11 (quoting *Taylor v. Monsanto Co.*, 150 F.3d 806, 809 (7th Cir. 1998)], it is also true that, standing alone, a plaintiff's own deposition testimony can be sufficient to withstand a motion for summary judgment. *See Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015).

Defendant also points to the primary duty rule in support of its argument that summary judgment is appropriate. "[T]he primary duty rule provides ship owners with a complete defense against Jones Act and unseaworthiness claims." *Churchwell*, 444 F.3d at 909. In essence, "[t]he primary duty rule provides that a ship's officer may not recover against his employer for negligence or unseaworthiness when there is no other cause of the officer's injuries other than the officer's breach of his consciously assumed duty to maintain safe conditions aboard the vessel." *Id.* (internal citations omitted). Importantly, "[t]he primary duty rule does not bar recovery where the plaintiff breached his duty but the ship's owner was also independently at fault. In such cases, the jury must apply the doctrine of comparative negligence." *Id.* (internal citations omitted). The Court finds that the primary duty rule does not apply in this case. There is no evidence that Plaintiff assumed the duty of mopping or otherwise cleaning and/or drying the galley floor. Indeed, the only evidence presented regarding those duties is found in Plaintiff's deposition testimony, wherein she testified that this duty was specifically assigned to the deckhands. Consequently, it cannot be that Plaintiff had consciously assumed the duty of completing this task herself.

In sum, the dispute as to the condition of the galley floor at the time Plaintiff slipped and fell on September 16, 2015 remains in dispute, and Plaintiff's deposition testimony has created a genuine dispute regarding whether the deckhands should have remedied the transitory condition

by mopping the floor after breakfast that morning and before Plaintiff returned to the galley around 8:30 a.m. The question of unseaworthiness is one rarely dispensed of at the summary judgment phase, *Churchwell*, 444 F.3d at 904, and the Court here finds it appropriate to allow a jury to resolve this question.

### C.

Plaintiff's third claim is one for general maintenance and cure. [DN 1, at 1.] In 1993, the Sixth Circuit Court of Appeals instructed as follows:

> Rather than relying upon the protection of workers' compensation statutes, seamen who suffer illness or injury on the job look to a unique package of remedies. Due to historical tradition and the realization that seamen are required to endure special perils and hardships, federal common law of the sea accords seamen special relief not available to other workers, including maintenance, cure, and unearned wages…Maintenance refers to a shipowner's obligation to provide a mariner with food and lodging if he becomes injured or falls ill while in service of the ship, while cure alludes to the duty to provide necessary medical care and attention…A shipowner is liable to pay maintenance and cure to the point of maximum cure, that is, when the seaman's affliction is cured or declared to be permanent…Finally, a shipowner must also pay a stricken seaman's unearned wages at least so long as the voyage is continued.

*Blainey v. Am. Steamship Co.*, 990 F.2d 885, 886-87 (6th Cir. 1993) (internal citations omitted). "Maintenance and cure is a claim independent of a claim under the Jones Act or a claim of unseaworthiness." *Alrayashi v. Rouge Steel Co.*, 702 F. Supp. 1334, 1338 (E.D. Mich. 1989).

"Over the years, the courts have broadened the duty to pay maintenance and cure. It is now well-settled that maintenance and cure is payable even though the shipowner is not at fault, and regardless of whether the seaman's employment caused the injury or illness." *Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1357 (6th Cir. 1996) (citing *Calmar Steamship Co. v. Taylor*, 303 U.S. 525, 527 (1938)). Importantly, "[t]he duty to pay maintenance and cure does not necessarily end with the voyage on which the seaman falls ill, but can continue beyond," *id.*, and "a shipowner must pay maintenance and cure for any illness or injury which occurred, was

aggravated, or manifested itself while the seaman was in the ship's service." *West v. Midland Enters., Inc.*, 227 F.3d 613, 616 (6th Cir. 2000).

Here, Defendant argues in its instant Motion that it "has fully discharged its obligation to pay maintenance and cure," and that this claim should therefore be dismissed by this Court. [*See* DN 21-1, at 15.] In her Response, Plaintiff merely states the following: "If Defendant would have sought concurrence, Plaintiff would've concurred on this argument." [DN 24, at 3.] In the Court's view, then, there is no genuine dispute as to any material fact regarding whether Plaintiff received full maintenance and cure from Defendant with respect to her injury incurred while working on the M/V Leader, as those terms are described above. Consequently, Defendant is entitled to summary judgment on this claim.

### IV. Conclusion

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendant's Motion, [DN 21], is **DENIED** as to Plaintiff's claims for negligence under the Jones Act and unseaworthiness, and **GRANTED** as to Plaintiff's claim for maintenance and cure**.**

**IT IS SO ORDERED.**

cc:     Counsel of Record